1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

8
9
10
11
12

| Marty Cortez, et. al., | No. cv-09-526-TUC-JGZ (CRP) |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| vs. | |
| State of Arizona, et. al., | |
| Defendants. | |

13   Pending before the Court is Defendants' Motion for Summary Judgment on all
14 five counts in Plaintiffs' Second Amended Complaint. (Doc. 188; Doc. 189 Defendants'
15 Statement of Facts).[1] This case arises from an attack on Plaintiff Philip Cortez by two
16 other inmates while all three inmates were in the custody of the Arizona Department of
17 Corrections. The attack, at the Arizona State Prison Complex-Lewis, left Plaintiff Cortez
18 with a traumatic brain injury and severe mental impairment. Plaintiff and his mother
19 (collectively "Plaintiffs") are suing three Department of Corrections' officers and the
20 State of Arizona. Plaintiffs allege Defendants are responsible for Plaintiff Cortez's
21 injuries.

22   The Magistrate Judge held oral argument on August 2, 2011. (Doc. 215). The
23 Magistrate Judge now issues his report and recommendation to the District Court
24 pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.

25
26
27
28

---

[1] Plaintiffs' Second Amended Complaint was filed on September 29, 2010. (Doc. 131). Plaintiffs filed their Response to the Motion for Summary Judgment. (Doc. 197, Doc. 198 Plaintiffs' Statement of Facts). Defendants filed their Reply. (Doc. 210; Doc. 208 Defendants' Objections to Plaintiffs' Statement of Facts and Exhibits).

**I. FACTS**

The facts summarized in this section are uncontested unless otherwise indicated. At oral argument, Plaintiffs agreed to withdraw the Motion to Strike Declarations. (Doc. 195). Allegations not dispositive of the motion are omitted from this section.

On November 16, 2007, Plaintiff Philip Cortez ("Plaintiff Cortez") was an inmate at the Arizona Department of Correction ("ADOC")'s Buckeye facility. (Doc. 131, at 2).[2] Plaintiff Cortez was housed in the Morey Detention Unit ("MDU"), which is one of several buildings that comprise the Morey Unit. (Doc. 131, at 2; Doc. 189, ¶ 5). During a transport from the Morey Unit visitation building back to the MDU, two other MDU inmates – Juan Cruz and Steve Lavender – assaulted Plaintiff Cortez. (Doc. 198, ¶ 2; Doc. 189, ¶ 33). The severity of the attack, which consisted of "inmates Cruz and Lavender push[ing] Plaintiff Cortez to the ground, and then kick[ing] and stomp[ing] on his head for five (5) minutes," left Plaintiff Cortez in a state of permanent mental incapacitation. (Doc. 131, at 2).

Defendant Skol was working as a visitation officer at the Morey Unit visitation building on the day of the attack. (Doc. 189-1, ¶ 2). He was transporting the three inmates when Plaintiff Cortez was attacked. Defendant Skol has been employed by ADOC since 2004. (Doc. 189-1, ¶ 1). For approximately four years, Defendant Skol worked at the Arizona State Prison Complex ("ASPC")-Lewis-Morey Unit located in Buckeye, Arizona, as a Corrections Officer ("CO") II.[3] (Doc. 189-1, ¶ 1).

Defendant DeFabiis was working in the MDU and he was responsible for preparing the three inmates for transport, which included placing them in restraints. (Doc. 189-1, ¶ 11). The ADOC employed Defendant DeFabiis for approximately ten years; from 2006 to 2008 Defendant DeFabiis was assigned to the MDU. (Doc. 189-1, ¶ 1).

---

[2] In this Report and Recommendation, the Magistrate Judge references page numbers according to the pagination provided by the Court's CM/ECF system.

[3] The Roman Numerals that directly follow the "CO" label designate the rank of the specific officer. In this case, Defendants Skol and DeFabiis were both CO II.

Defendant Kendall was a sergeant in charge of security for the Morey Unit on the day of the attack. (Doc. 189-2, ¶¶ 3, 6). He had no direct role in the incident. (Doc. 189-2, ¶¶ 7, 9). At the time of the incident, Defendants Skol, DeFabiis, and Kendall were all employees of Defendant State of Arizona ("State").

The MDU is separated from the other Morey Unit buildings and the Morey Yard because it houses detention inmates. (Doc. 189, ¶ 6). Prison officials place inmates in the MDU to segregate them from the general prison population. (Doc. 198-3, at 3). Some inmates are in the MDU for committing violent acts against other inmates while other inmates are there because they are at risk of being assaulted. (Doc. 198-3, at 3-5). Inmates placed in the MDU who are at risk of being assaulted are commonly known as "protective custody" ("PC") inmates. (Doc. 198-4, at 4; Doc. 198-9, at 5; Doc. 189-1, ¶ 3).[4] Security Threat Group ("STG") inmates are also in the MDU. (Doc. 198, ¶¶ 5-6; Doc. 198-5, at 5). STG inmates are affiliated with prison gangs. (Doc. 189-1, ¶ 6).

Visitation officers are in charge of escorting inmates to and from their housing facility to the visitation building. (Doc. 189, ¶ 2). According to Defendants, MDU inmates are not escorted through the Morey Yard, which is the common area for non-MDU Morey Unit inmates, because this would require all Morey Unit inmates to be locked down for safety and security reasons. (Doc. 189, ¶ 8; Doc 189-1, ¶ 7).[5] Moreover, locking down the entire Morey Unit causes disruption in daily prison operations and hampers inmates who are participating in programming and educational activities or receiving medical treatment. (Doc. 189-1, ¶ 10). Instead, prison officials escort MDU inmates to and from the Visitation Building through an area commonly known as "no-man's land," which is an "unpaved, hard compacted dirt area characterized by small pebbles and rocks and crevices." (Doc. 189, ¶ 8).

---

[4] "PC" inmates may also be referred to as "PS" (protective segregation) inmates. (Doc. 189-1, ¶ 3). The Magistrate Judge will refer to these inmates as PC inmates.

[5] When inmates are "locked down" they are moved back to their cells and locked in. Here, Defendants assert that MDU inmates are "higher custody" inmates (Level 5) and have to be segregated from regular Morey Unit inmates at all times, including during transport. (Doc. 189-1, ¶ 6; Doc. 189-1, ¶ 10).

Before inmate escort, MDU officers place restraints on the inmates. (Doc. 189, ¶ 9). In his investigation of the incident, ADOC Special Investigator Philip Schonig noted MDU Post Order 017.06, sub-section 1.1 required prison officials to restrain inmates in upper and lower metal restraints during escort procedures. (Doc. 198-2, at 7). Plaintiffs also maintain that Post Order 017.13, Section 1.1.1., effective August 10, 2007, required leg restraints during inmate escort. (Doc. 198-11, at 9). This order stated, in pertinent part: "[w]hen conducting inmate movement within the detention area, upper restraints (handcuffs or belly chains) are required. When conducting inmate movement out of the detention unit, upper and lower restraints are required." (Doc. 198-11, at 9).

On November 16, 2007, Defendant DeFabiis was the officer in charge of placing restraints on inmates being escorted from the MDU to the visitation building. (Doc. 198, ¶ 37; Doc. 198-8, at 3; Doc. 198-2; at 12). Defendant DeFabiis claims that, despite the Post Order requiring leg restraints, he and other MDU officers did not use leg restraints when visitation officers escorted MDU inmates through "no-man's land." (Doc. 189-1, ¶ 11). Allegedly, former Morey Unit Deputy Warden Edwards issued a directive stating that leg restraints not be placed on MDU inmates during escort because of a past accident involving an MDU inmate who fell and injured himself in "no-man's land" during escort while wearing leg restraints. (Doc. 189-1, ¶ 11; Doc. 198-2, at 12). According to Defendants, Former Deputy Warden Edward's policy was well-known by MDU and visitation officers and, prior to the incident with Plaintiff Cortez, they did not witness any violent altercations between MDU inmates during escort. (Doc. 189, ¶¶ 9-11, 61-63). Defendants were unable to locate a copy of Former Warden Edward's directive. (Doc. 189, ¶ 9; Doc. 198-9, at 6-7).

Two prison officials in charge at the time of the incident, Deputy Warden Kevin Curran[6] and Captain Brian Wilson[7], conceded that escorting MDU inmates without leg

---

[6] Deputy Warden Curran took over as Deputy Warden of the Morey Unit in August 2007.  (Doc. 198, ¶ 40).

[7] Captain Wilson was the Chief of Security at the prison on the date of the incident.  (Doc. 198, ¶ 42).

restraints was a violation of the Post Order on the date of the incident. (Doc. 198-9, at 3-4; Doc. 198-10, at 3-4). Defendant Skol also testified that he was aware of the Post Order mandating the use of full restraints for MDU inmates. (Doc. 198-3, at 9-10).

To prepare inmates Cortez, Cruz, and Lavender for escort to visitation, Defendant DeFabiis placed the inmates in "belly chains".[8] (Doc. 198-8, at 3; Doc. 198-2, at 12). Defendant DeFabiis did not use leg restraints allegedly in accordance with former Deputy Warden Edward's directive. (Doc. 189, ¶¶ 71-72). Defendant Skol and Defendant Skol's partner, COII Roger Smith ("Officer Smith"), then escorted inmates Cortez, Cruz, and Lavender from the MDU to the visitation building. (Doc. 198-2, at 12; Doc. 189, ¶¶ 12, 14).

Defendant Skol and Officer Smith were the only two visitation officers working the Morey Unit on November 16, 2007. (Doc. 189, ¶ 12). Once at the visitation building, Defendant Skol and Officer Smith did not permit the inmates physical contact with their visitors and they kept the inmates in holding enclosures known as the "back cage" before, during, and after their visitation. (Doc. 189, ¶¶ 16,18). According to Defendants:

> The back cage is an enclosure with wall and glass in the front that separates the visitors from the inmates. The visitors are in the visitation area of the room and talk to the inmate they are visiting through small areas in the glass…The inmates can talk to each other while in the back cage, but discussions between the inmates while in the back cage cannot be heard in the visitation area…Typically, there is a visitation officer stationed in the visitation room and a visitation officer in the lobby where the visitation administrative office is located. There is no officer located or stationed in the back cage with the inmates…Because [Defendant] Skol was on the other side of the glass partition from where inmates Cortez, Cruz, and Lavender were, he did not, and could not, hear any conversations between them.

(Doc. 189, ¶¶ 19-22). Officer Smith was located in the administrative lobby during the visitation period. (Doc. 189, ¶ 23).

While it is common knowledge among correctional officers that MDU inmates are

---

[8] "Belly chains" consist of handcuffs attached to a chain around the inmate's waist.  (Doc. 189, ¶ 12).

potential security risks, both Defendant Skol and Defendant DeFabiis claim that they had no specific information as to why inmates Cortez, Cruz, and Lavender were in the MDU. (Doc. 198, ¶ 4; Doc. 189-1, ¶ 14, at 6; Doc. 189-1, ¶ 11, at 17). Moreover, both declare they "observed no arguments, heated words, harassing words, or issues of any kind between any of these three inmates while escorting them between the MDU and the [v]isitation [b]uilding" or while they were at visitation. (Doc. 189-1, ¶¶ 15, 16, at 6; Doc. 189-1, ¶¶ 12, 13, at 17-18). Plaintiffs offer evidence disputing these assertions.

Plaintiffs contend officers have general knowledge concerning why inmates are housed in the MDU including that inmates are there for disciplinary, investigation, or STG reasons. (Doc. 198, ¶ 5). Plaintiffs also assert that Defendant Skol knew of animosity between the three inmates. (Doc. 198, ¶ 8). Defendant Skol's partner, Officer Smith, told Special Investigator Schonig that "he later heard [from] COII Skol there was a lot [sic] talk and harassing words between the three inmates in the back cage." (Doc. 198-2, at 11).  In his later declaration, Officer Smith claims that his statement was ambiguous and he meant Defendant Skol heard about the inmates' harassing words "*after* the incident as an explanation for why the attack occurred." (Doc. 189-1, ¶ 19, at 19) (emphasis in original).

Due to time constraints on the day of the attack, Defendant Skol was in a rush to get the inmates back to the MDU after their visitation period ended. (Doc. 189, ¶ 25-26; Doc. 198-2, at 10). Defendant Skol's partner, Officer Smith, was busy completing paperwork. (Doc. 189, ¶ 27). Defendant Skol believed the best ratio for inmate escort was 1:1, or one officer for every inmate.  He had previously advised other officers, including Officer Smith, of this policy, warning that the most inmates any one officer should ever move by himself is two.  (Doc. 198, ¶ 11; Doc. 189-1, ¶ 18, at 19). Despite having a personal policy not to escort three MDU inmates alone, Defendant Skol decided to transport all three inmates at one time by himself in the interest of expediency. (Doc. 197, at 7; Doc. 210, at 6).

Defendants allege, [w]hile it is not the best or ideal practice for one officer to

escort three inmates, there was no ADC rule or policy prohibiting it, and it was often done by visitation officers before November 16, 2007, without any problems, and Officer Skol had done it before without problems." (Doc. 189, ¶ 27). Moreover, Defendants state that if Defendant Skol had known of animosity between the inmates he would not have escorted them back to the MDU without another officer because of the risk to the inmates and himself. (Doc. 189, ¶ 28). Plaintiffs argue Defendant Skol not only violated his own personal policy, but the policy of every other officer questioned about escorting procedures. (Doc. 198, ¶ 12). Indeed, no fewer than three correctional officers and Special Investigator Schonig testified in deposition that they would be uncomfortable escorting three inmates; two of these officers stated they would not escort three inmates without assistance.[9] (Doc. 198, ¶ 13-15; Doc. 198-2, at 10-12; Doc. 198-4, at 4; Doc. 198-6, at 3).

At approximately 10:25 a.m., Defendant Skol escorted Plaintiff Cortez, Cruz, and Lavender from the visitation building to the MDU through "no-man's land". (Doc. 189, ¶ 30). At oral argument, counsel for Plaintiffs stated that Defendant Skol was distracted during the escort because he was pushing a cart of records. Plaintiffs' expert, Walter "Kip" Kautzky, repeated this allegation in his declaration made under oath and in his expert report. (Doc. 198-1, at 2; Doc. 198-11, at 10).[10] When Defendant Skol and the inmates reached the locked gate that leads to the back entrance of the MDU, Cruz and Lavender pushed Plaintiff Cortez to the ground and began kicking him and stomping on his head. (Doc. 198, ¶ 2; Doc. 189, ¶ 33). Katutzky, Plaintiffs' expert, maintains that Defendant Skol admitted in his incident report that he turned his back on Cruz and Lavender when he went to unlock the MDU gate. (198-11, at 10). Defendants contend that all three inmates were in Defendant Skol's view at all times, including when

---

[9] These officers are Smith, COII Roy Williams, and COIV Rick Jackson. (Doc. 198-2, at 10-12). Schonig and Jackson testified the same at their respective depositions. (Doc. 198-4, at 4; Doc. 198-6, at 3).

[10] In fact, Kautzky further asserts that Defendant Skol failed to disclose that he was pushing a cart in his original report of the incident. (Doc. 198-11, at 10).

1  Defendant Skol attempted to unlock the MDU gate. (Doc. 189, ¶ 34).

2  At 10:30 a.m.,[11] Defendant Skol verbally directed Cruz and Lavender to stop their

3  assault on Plaintiff Cortez and get on the ground. (Doc. 198-7, at 2). Cruz and Lavender

4  ignored Defendant Skol's order, prompting Defendant Skol to contact incident command

5  system ("ICS"), which alerts officers that assistance is needed. (Doc. 189, ¶ 35). At 10:31

6  a.m. Defendant Skol reports he gave another verbal directive to Cruz and Lavender to

7  stop and get on the ground and again both inmates ignored his command. (Doc. 198-7, at

8  2). Defendant Skol again ordered Cruz and Lavender to stop and get on the ground in "a

9  louder voice" and warned he would deploy chemical agents. (Doc. 198-7, at 2).

10  At 10:32 a.m., Defendant Skol deployed a one-second burst of his Oleoresin

11  Capsicum ("OC") spray[12] in the facial areas of Cruz and Lavender but they continued

12  their assault on Plaintiff Cortez. (Doc. 198-7, at 2; Doc. 198, ¶ 29). At 10:33 a.m.,

13  Defendant Skol deployed another one-second burst of OC spray and again it was

14  ineffective in stopping the attack. (Doc. 198-7, at 2). At 10:34 a.m., Defendant Skol

15  sprayed Cruz and Lavender for a third time as backup officers COII Hawthorne, COII

16  Casper, and COII Springsteen arrived to the scene. (Doc. 198-7, at 2).[13] At no time did

17  Defendant Skol use physical force to stop the assault, believing he could potentially be

18  injured, taken as a hostage, or have items such as his keys and OC spray taken from him.

19  (Doc. 189, ¶ 36). The parties dispute what happened next.

20  According to Defendants, Cruz and Lavender instantly dropped to the ground and

21  followed orders when they saw the backup officers arriving. (Doc. 189, ¶ 41; Doc. 198-7,

22  at 2). Plaintiffs, on the other hand, argue that Officers Hawthorne and Casper had to

---

23  [11] The exact time the attack began is unclear from the reports.  In his incident report, Defendant

24  Skol notes that at 10:25 a.m. he was in the process of escorting the inmates from the visitation building to
   the MDU.  The inmates initiate the attack sometime between 10:25 a.m. and 10:30 a.m., when Defendant

25  Skol states he called in the ICS strike team.  (Doc. 198-7, at 2).

26  [12] Oleoresin Capsicum spray is a form of pepper spray.  (Doc. 189, ¶ 39).

   [13] The parties dispute the times listed in Defendant Skol's report to the extent that Plaintiffs

27  follow the precise chronological times as they appear in the report while Defendants state the times are
   rounded to the nearest minute and do not represent the precise times when actions occurred.  (Doc. 198,

28  ¶¶ 28-30; Doc. 189, ¶ 38).

physically intercede to stop the assault. (Doc. 198, ¶ 32). Plaintiffs rely on the testimony of Sergeant Hawthorne who stated in his deposition that he physically intervened to break up the attack. (Doc. 198, ¶ 35). Sergeant Hawthorne testified he placed his hands on Cruz "plac[ing] him on the ground" and that Officer Casper then held Cruz down while Sergeant Hawthorne "wrestled" with Lavender to subdue him. (Doc. 198-5, at 13-14). This testimony from Sergeant Hawthrone conflicts with his alleged written report from the day of the attack. His written report states Cruz and Lavender voluntarily ceased their assault and got on the ground. (Doc. 198, ¶ 35). During his deposition testimony, Sergeant Hawthrone stated that the disclosed report was not the report he submitted and that the signature was forged. (Doc. 198-5, at 12-13). He stated that his actual report was handwritten. (Doc. 198-5, at 12-13).

An internal report about the attack shows inmate Cruz said he attacked Plaintiff Cortez because Plaintiff Cortez was "running his mouth about being a PC inmate and it was none of my (Cruz) business and he (Cortez) did not have to answer to anyone." (Doc. 180-1, at 5). Inmate Cruz also alleged Plaintiff Cortez called him and inmate Lavender "clown[s]." (Doc. 180-1, at 5). While Cruz stated Plaintiff Cortez's comments about his PC status led to the attack, the parties contest the significance of Plaintiff Cortez's classification. Plaintiff Cortez was not a PC inmate at the time of the incident; he was in the MDU because of a disciplinary infraction. (Doc. 189, ¶ 91). Plaintiff Cortez had requested protective segregation in June 2007 but this request was denied. (Doc. 189, ¶ 92). The prison records show Plaintiff Cortez was transferred to a different unit as a response.  (Doc. 189-2, at 41-51).

The parties also contest the significance of inmate Cruz's classification as a STG member. Sergeant Hawthorne testified in deposition that he knew inmate Cruz was classified as an STG inmate and that he knew inmate Cruz was an enforcer for the New Mexican Mafia. (Doc. 198-5, at 9-11). He further testified that most other detention officers should have also known that inmate Cruz was classified STG. (Doc. 198-5, at 11). Defendants argue Cruz's classification cannot factor into the analysis because there

is no proof that Defendant Skol or Defendant DeFabiis knew inmate Cruz was classified as an STG inmate. Plaintiffs argue that Sergeant Hawthorne's testimony supports their position that Defendants would have known inmate Cruz's classification.

Plaintiffs argue the knowledge that Plaintiff Cortez had at one point been a PC inmate and inmate Cruz was STG gave inmate Cruz motive to attack Plaintiff Cortez and that if Defendants had this knowledge, it shows deliberate indifference to Plaintiff Cortez's safety. PC inmates are targets for violence because other inmates believe they are snitches.[14] (Doc. 198, ¶ 22; Doc. 198-1, ¶ 19). As such, Sergeant Hawthorne stated "all PC inmates have what they call a 'green light.' It means any race, at any time, they're supposed to attack them and take them out." (Doc. 198-5, at 8).

Plaintiff Marty Cortez, Cortez's mother and his legal Conservator and Guardian, brought this suit on behalf of herself and her son. (Doc. 131, at 1). In their Second Amended Complaint, Plaintiffs raise five claims:

| | |
|---|---|
| Count One: | Gross Negligence, Defendant State of Arizona<br>(Plaintiffs Philip and Marty Cortez) |
| Count Two: | 42 U.S.C. § 1983, Defendant Skol<br>(Plaintiff Philip Cortez) |
| Count Three: | 42 U.S.C. § 1983, Defendant Kendall<br>(Plaintiff Philip Cortez) |
| Count Four: | Punitive Damages, 42 U.S.C. § 1983, all Defendants<br>(Plaintiff Philip Cortez) |
| Count Five: | 42 U.S.C. § 1983, Defendant DeFabiis<br>(Plaintiff Philip Cortez) |

(Doc. 131).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most

---

[14] Deputy Warden Curran testified in his deposition that PC status does not automatically lead to the inference that an inmate is an informant or snitch. (Doc. 198-9, at 5).

favorable to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Jesinger v. Nev. Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). "Only disputes over facts that might affect the outcome of the suit ... will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see Jesinger,* 24 F.3d at 1130. The disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

### III. PRELIMINARY MATTERS

In their Motion, Defendants sought summary judgment on all § 1983 claims brought by Plaintiff Cortez's mother, Marty Cortez, on her own behalf. In their response, Plaintiffs clarified that Plaintiff Marty Cortez has no independent § 1983 claims. (Doc. 197, p. 4). The § 1983 claims are Plaintiff Philip Cortez's claims, brought by Marty Cortez on behalf of her son. Also, Plaintiffs do not contest summary judgment on the claims against Defendant Sergeant Kendall. (Doc. 197, p. 3).[15] Thus, the Court should grant summary judgment on Count Three in the second amended complaint.

Finally, Plaintiffs argue their § 1983 claims against Defendant DeFabiis and Defendant Skol should be analyzed as violations of both the Eighth Amendment and the Fourteenth Amendment. Plaintiffs are incorrect. Because the constitutional claims at issue are specifically covered by the Eighth Amendment, the claims must be analyzed under Eighth Amendment standards rather than the standards for substantive due process under the Fourteenth Amendment. *See United States v. Lanier,* 520 U.S. 259, 272 fn. 7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.")

---

[15] While Plaintiffs agree to summary judgment on the § 1983 claim against Defendant Kendall, they maintain that Defendant Kendall's conduct should be included in considering their gross negligence claim against the State of Arizona.  (Doc. 197, at 3,4).

(citing *Graham v. Connor*, 490 U.S. 386 (1989)), *see also Gibson v. County of Washoe, NV*, 290 F.3d 1175, 1187 (9th Cir.2002) (noting that since the plaintiff was only arrested and not convicted of a crime, his rights derived from the due process clause and not the Eighth Amendment).[16]

Plaintiffs' list of cases discussing Fourteenth Amendment due process violations with liability arising under § 1983 do not alter this Court's conclusion. (Doc. 197, at 3, 5, 17). The cases cited for independent Fourteenth Amendment violations do not involve prisoners. They involve people interacting with police in public, pretrial detainees, and people involuntarily committed. *See Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir.2007) (Group of citizens collectively brought suit against city under § 1983 for injuries sustained during Mardi Gras celebration); *See Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir.1997) (mother of deceased man brought § 1983 action against the city after the police responded to emergency call on his behalf and failed to render him any assistance); *See DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989) (mother of abused child brought action under § 1983 against the department of social services alleging the department deprived the child of his liberty interest in bodily integrity by failing to remove the child from his abusive father); *See Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989) (passenger of impounded vehicle left stranded alone at night in a dangerous area brought action under § 1983 against the state trooper); *See L.W. v. Grubbs*, 974 F.2d 119 (9th Cir.1992) (nurse at medium security custodial institution initiated a § 1983 action against her supervisors after she was raped by an inmate); *See Youngberg v. Romeo* 457 U.S. 307 (1982) (mother of mentally disabled individual involuntarily committed to a state institution filed a suit under § 1983 against the institution officials claiming violations of his Eighth and Fourteenth Amendments and Court held that the Eighth Amendment was not the proper source for determining rights of the involuntarily committed). The Magistrate Judge notes that "[w]here a particular

---

[16] The Fourteenth Amendment does extend § 1983 liability to a state and state officials for a violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 101 (1976).

amendment 'provides an explicit textual source of constitutional protection' against a particular sort of governmental behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [a plaintiff's] claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994), Rehnquist, C.J., for plurality (quoting *Graham*, 490 U.S. at 395). The Magistrate Judge analyzes Plaintiffs' § 1983 claims as alleged violations of the Eighth Amendment.

## IV. ANALYSIS

### A. Plaintiffs' § 1983 Claims

Defendants contend they are entitled to summary judgment on the § 1983 claims because neither Defendant DeFabiis nor Defendant Skol was "deliberately indifferent" to Plaintiff Cortez's safety on the day he was injured. Plaintiffs assert a reasonable jury could find that Defendants Skol and DeFabiis acted with deliberate indifference and that their actions or lack of actions led to Plaintiff Philip Cortez's injuries. (Doc. 197, at 3-12).

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must [allege] that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49-50 (1999). Where conditions of confinement are at issue, the Supreme Court has held that a prison official violates the Eighth Amendment only when both an objective and subjective requirement are met. "First, the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Second, "a prison official must have a 'sufficiently culpable state of mind.' " *Id.* (quoting *Wilson,* 501 U.S. at 297). "In prison-condition cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson,* 501 U.S. at 302-303).

At issue in Defendants' Motion is the second requirement, whether Defendant Skol and Defendant DeFabiis acted with deliberate indifference to Plaintiff Cortez's

safety. *Farmer*, 511 U.S. at 834. To act with deliberate indifference a prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "[M]ere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir.1998). "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. However, inferring that a prison official knew of a substantial risk because a reasonable person would have known or the prison official should have known is not sufficient under *Farmer's* subjective component. *Id*. The factfinder must conclude that the given prison official actually knew of the risk. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id*.

### 1. Defendant DeFabiis

Plaintiffs allege Defendant DeFabiis acted with deliberate indifferent to Plaintiff Cortez's safety by failing to place leg restraints on Plaintiff Cortez and the two other inmates prior to their escort to the visitation building. (Doc. 197, pp. 11-12). Based on the evidence offered in the briefing, a jury could not conclude that Defendant DeFabiis was deliberately indifferent.

Defendant DeFabiis was assigned to the MDU on the day of the attack. He was responsible for securing the inmates for transfer from the MDU to visitation and back from visitation. Defendant DeFabiis chose not to place leg irons on the inmates. This choice was a violation of the post order and Defendant DeFabiis did know about the post order as he had signed a verification that he had read it. (Doc. 198, ¶ 38; Doc. 198-8, p. 4-5). This violation is not, by itself, sufficient to prove an Eighth Amendment violation. *Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir.1981).

Defendant DeFabiis was following the status quo in not restraining the inmates in leg irons. The evidence shows there was, at a minimum, an informal, unwritten policy

that inmates should not be placed in leg irons if they were to be transferred across "no man's land." A former warden set this policy after an inmate was injured when he tripped during transfer across the no man's land area while in leg irons. There is no evidence that anyone prior to Plaintiff Cortez was injured because inmates were not routinely placed in leg irons. A reasonable jury could not find Defendant DeFabiis knew of a substantial risk of serious harm based solely on his decision to follow an informal policy and not place Plaintiff Cortez and the other two inmates in leg restraints.

Plaintiffs also contend Defendant DeFabiis knew of Plaintiff Cortez's prior PC classification and the other inmates' potential gang affiliations. While Defendant DeFabiis admits that he saw a "whiteboard" in the MDU Sergeant's office that color codes inmates based on whether they are in MDU for disciplinary reasons or for protective custody, there is no evidence Plaintiff Cortez was color coded as a protective custody inmate. (Doc. 189-1, ¶ 4, at 25). The parties disagree as to whether Cortez's prior PC status would have been known to the officers and the other inmates. Even if Defendant DeFabiis knew Plaintiff Cortez had been in protective custody previously and he knew that inmate Cruz was classified STG, a reasonable jury could not conclude that Defendant DeFabiis acted with deliberate indifference when he secured the inmates for transport together without leg irons. At the time of the incident, all three inmates were in the MDU for disciplinary reasons. Plaintiff Cortez was not in protective custody. Inmates housed in the MDU for disciplinary reasons can be escorted together unless there is a known issue between the inmates. (Doc. 189-1, ¶¶ 4-5, at 25).

The other evidence cited by Plaintiffs cannot be attributed to Defendant DeFabiis. There is no evidence Defendant DeFabiis knew that Defendant Skol would transfer the three inmates back to MDU from visitation by himself. Defendant Skol hastily made this decision when he learned his partner was busy with paperwork and he determined to get the inmates back to the MDU before the prisoner count. Based on the testimony from depositions, most officers would not be comfortable escorting three prisoners with only one officer – further evidence that Defendant DeFabiis would not have thought

Defendant Skol would make that decision. (Doc. 198, ¶ 13-15; Doc. 198-2, at 10-12; Doc. 198-4, at 4; Doc. 198-6, at 3).

There is also no evidence that Defendant DeFabiis knew of any harassing words or animosity between the three inmates. Plaintiffs allege Defendant Skol heard animosity during transport or while the inmates were in the visitation building. Defendant DeFabiis would not have known about comments or animosity that happened after the inmates left MDU.

Given the above facts, a reasonable jury could not return a verdict in favor of Plaintiffs on the § 1983 claim against Defendant DeFabiis. Even if Defendant DeFabiis knew Plaintiff Cortez had at one point been classified as a PC inmate and that the other inmates had potential gang affiliations, a reasonable jury could not find that DeFabiis acted with deliberate indifference when he followed a former warden's policy from which no incidents had previously risen and to Defendant DeFabiis's knowledge, two officers were transporting these three inmates.

**2. Defendant Skol**

Plaintiffs contend a reasonable jury could find Defendant Skol acted with deliberate indifference to Plaintiff Cortez's safety. This Court agrees. Based on decisions Defendant Skol made and facts he knew, the substantial risk to Plaintiff Cortez was so obvious that a reasonable jury could conclude he knew of the substantial risk and disregarded it.

To begin, Defendant Skol violated his and several other officers' personal policy when he escorted three MDU inmates by himself. (Doc. 197, at 7; Doc. 210, at 6; Doc. 198, ¶ 11; Doc. 189-1, ¶ 18, at 19; Doc. 198, ¶ 12). Defendant Skol was in a hurry to get the three inmates back to the MDU for a prisoner count. His partner, Officer Smith, was busy completing paperwork. Rather than wait for his partner to finish the paperwork, Defendant Skol made a quick decision to transport all three inmates alone. Plaintiffs presented the testimony of no fewer than three correctional officers and Special Investigator Schonig who all stated that they would be uncomfortable escorting three

inmates alone; two of these officers stated they would not escort three inmates without assistance. (Doc. 198, ¶ 13-15; Doc. 198-2, at 10-12; Doc. 198-4, at 4; Doc. 198-6, at 3). In his report, Special Investigator Schonig relayed COIV Jackson's candid articulation of this escorting procedure: "COIV Jackson said usually escorting three inmates is not an issue if the escort is out in the open where it can be viewed by other staff or camera. [He] said escorting in 'no man's land' is out view and he would not escort three inmates by himself back there." (Doc. 198-2, at 12).

There is also evidence that while rushing to get the inmates back to the MDU, Defendant Skol pushed a cart during the transfer. Pushing the cart potentially distracted Defendant Skol from his duty to supervise the inmates at all times during the escort. (Doc. 198-11, at 10; Doc. 189, ¶ 30; Doc. 198-11, at 10). Transferring the three inmates across "no man's land" further increased the risk to Plaintiff Cortez. (Doc. 189, ¶¶ 7-8).

Plaintiffs also presented evidence that Defendant Skol knew of a potentially dangerous relationship between the inmates. After the attack on Plaintiff Cortez, Defendant Skol's partner, Officer Smith, told prison investigator Schonig that Defendant Skol told him he had heard the inmates having words with each other in the back cage before Defendant Skol transported the inmates back from visitation to the MDU. (Docs. 198, ¶ 8; 198-2, at 11). According to Officer Smith's original recollection, Defendant Skol "heard … a lot of talk and harassing words between the three inmates in the back cage and when [he] open the gate, [inmate] Lavender stood in front to block [his] view while [inmate] Cruz was kicking [Plaintiff] Cortez." (Doc. 198-2, at 11). Officer Smith subsequently modified that statement and claims that he meant Defendant Skol learned of this information after the attack and the information clarified why the attack occurred. The point at which Defendant Skol learned of the animosity between the inmates is a question of material fact that should be decided by the jury as it can factor into whether Defendant Skol was deliberately indifferent when he chose to transfer these inmates by himself without leg irons.

Further, based on Sergeant Hawthorne's deposition testimony, a reasonable jury

- 17 -

could conclude Defendant Skol knew that Plaintiff Cortez had been a PC inmate in the past and had recently applied and been rejected for PC classification. Also, Defendant Skol may have known of inmate Cruz's affiliation with the Mexican Mafia and that inmate Cruz and inmate Lavender had a "green light" to attack Plaintiff Cortez as he had been classified as PC. (Docs. 197, at 7-8; 198, ¶¶ 21, 24; Doc. 198-5, at 8-11; Doc. 198-4, at 8). These are genuine issues of material fact that should be decided by a jury.

It is also uncontested that Defendant Skol did not physically intervene during the attack, which lasted for approximately five minutes. (Doc. 189, ¶ 36; Doc. 198-7, at 2). The parties dispute whether Defendant Skol's actions during the attack were appropriate. Plaintiffs allege ADOC policies required Defendant Skol to use physical force to protect Cortez. (Doc. 197, at 8). Plaintiffs point to Post Order 017.22 which states in pertinent part:

> Staff shall use physical force only when persuasion, counseling, warnings, and direct orders are found to be insufficient to obtain cooperation from the inmate…As a pivotal point of staff safety, staff should avoid unnecessarily inserting themselves into dangerous or potentially dangerous situations. Unless there is an imminent threat to staff, inmates or property, planning should be considered prior to placing staff into a situation where use of force is possible or likely.

(Doc. 198-11, at 8). Defendants contend Defendant Skol correctly followed ADC policy by "initiating the ICS system to have other officers arrive for backup and assistance, directing the inmates to stop, and repeatedly using OC spray on the attackers." (Doc. 188, at 10).

When the attack began, Defendant Skol ordered inmate Cruz and inmate Lavender to stop. After they ignored his verbal command, he initiated the ICS. One minute into the attack, he gave another louder verbal order for the inmates to stop and warned he would use pepper spray. Two minutes into the attack, for the first time, Defendant Skol deployed a one-second burst of pepper spray in the face of inmates Cruz and Lavender, both of whom continued their assault of Plaintiff Cortez. (Doc. 198-7, at 2; Doc. 198, ¶

29). One minute later, Defendant Skol deployed another one-second burst of spray and it was again ineffective to stop the attack. Four minutes into the attack, Defendant Skol deployed pepper spray for a third time. Backup officers arrived on the scene at that time. As the backup officers intervened, Defendant Skol did not assist in stopping the attack. Defendant Skol alleges he acted reasonably and was not required to take "heroic measures" such as physical intervention thus risking serious injury to himself. (Doc. 188, at 10-11). Whether Defendant Skol's chosen measures were appropriate or whether they, as part of an aggregate, show his deliberate indifference to the safety of Plaintiff Cortez, considering the magnitude of the risk to himself and the extent of harm being inflicted upon Plaintiff Cortez, is a question of fact for a jury to decide.

Also relevant to a jury's determination of Defendant Skol's actions is Sergeant Hawthorne's testimony that he and another officer had to physically intervene to stop the attack. Defendant Skol testified that inmates Cruz and Lavender voluntarily ceased their attack on Plaintiff Cortez when backup officers Hawthorne and Casper arrived to the scene. (Doc. 198-3, at 6-7). In contrast, Sergeant Hawthorne testified he and Officer Casper physically intervened to stop the attack. (Doc. 198-5, at 12-15). Defendant Skol's version of how the attacked stopped is supported by Sergeant Hawthorne's official report of the incident – a report Sergeant Hawthorne says is forged. How the jury resolves this conflict in testimony between Sergeant Hawthorne and Defendant Skol will likely impact Defendant Skol's credibility. Who is telling the true story is a question of fact that should be determined by the jury.

In sum, a triable issue of material fact remains as to whether Defendant Skol was deliberately indifferent to Plaintiff Cortez's safety. Summary judgment is inappropriate on Plaintiffs' § 1983 claim against Defendant Skol.

**B. Qualified Immunity**

Defendants allege that if the § 1983 claims survive a summary judgment review, they are entitled to qualified immunity on these claims because neither Defendant DeFabiis nor Defendant Skol violated an established constitutional right of Plaintiff

1   Cortez. Plaintiffs argue Defendants DeFabiis and Skol are not entitled to qualified

2   immunity as they violated Plaintiff Cortez's right to be free from cruel and unusual

3   punishment, specifically his right to safety while incarcerated.[17]

4          A defendant in a § 1983 action is entitled to qualified immunity from damages for

5   civil liability if his or her conduct does not violate clearly established statutory or

6   constitutional rights of which a reasonable person would have known. *Harlow v.*

7   *Fitzgerald,* 457 U.S. 800, 818 (1982). The Supreme Court mandated a two-step sequence

8   for resolving a qualified immunity claim: the "constitutional inquiry" and the "qualified

9   immunity inquiry." *Saucier v. Katz,* 533 U.S. 194, 201 (2001) (receded from by *Pearson*

10  *v. Callahan,* 555 U.S. 223, 236 (2009) (courts are not required to analyze both steps if

11  either prong is not satisfied)). The "constitutional inquiry" asks whether, when taken in

12  the light most favorable to the non-moving party, the facts alleged show that the official's

13  conduct violated a constitutional right. *Id.* If so, a court would turn to the "qualified

14  immunity inquiry" and ask if the right was clearly established at the relevant time. *Id.* at

15  201-02. This second inquiry "must be undertaken in light of the specific context of the

16  case, not as a broad general proposition." *Id.* at 201. In *Pearson*, the Supreme Court held

17  that the *Saucier* procedure is not an inflexible requirement; judges "should be permitted

18  to exercise their sound discretion in deciding which of the two prongs of the qualified

19  immunity analysis should be addressed first in light of the circumstances in the particular

20  case at hand." 555 U.S. at 236.

21         Defendants argue both that they did not violate any constitutional right of Plaintiff

22  Cortez and also that whatever right may have been violated was not clearly established.

23  To begin, the Court disagrees with Defendants that the right at issue in this case was not

24  clearly established. It is well-settled that a prison official violates the Eighth Amendment

25  when the official acts with deliberate indifference to inmate health or safety. *Farmer,* 511

26  _____

27         [17]Plaintiffs also again allege Defendants violated Plaintiff Cortez's Fourteenth Amendment
    substantive due process right. As discussed as a preliminary matter, Plaintiff Cortez does not have an
28  independent Fourteenth Amendment claim.

U.S. at 833-834 (1994). To limit the "clearly established" aspect of the analysis to cases specifically addressing whether leg irons were used in transport or three prisoners were transported with one officer would allow Defendants, and other future defendants, "to define away all potential claims." *Kelley v. Borg,* 60 F.3d 664, 667 (9th Cir.1995) (denying qualified immunity when defendant viewed the right at issue with factual specificity instead of the general right to Eighth Amendment rights in the prison medical context).

Given Plaintiff Cortez's right was clearly established, the Magistrate Judge analyzes the first prong of the qualified immunity analysis. The Magistrate Judge considers whether the facts presented, viewed in favor of the non-movant, establish an Eighth Amendment violation. *Saucier*, 533 U.S. at 201; *Anderson*, 477 U.S. at 255.

**1. Defendant DeFabiis**

Defendant DeFabiis is entitled to qualified immunity. Defendant DeFabiis's only action in this case was his failure to place Plaintiff Cortez and the other two inmates in leg irons. While there was a post order requiring leg restraints, the unwritten policy was to not use leg restraints as a previous inmate had been injured in the past while walking to visitation across "no man's land" in leg restraints. This policy of not placing prisoners in leg restraints had been in place for some time and there were no known attacks resulting from this policy. Even viewing the facts in favor of Plaintiffs, they cannot establish that Defendant DeFabiis was deliberately indifferent to Plaintiff Cortez's safety.

**2. Defendant Skol**

Defendant Skol is not entitled to qualified immunity. Defendant Skol had a personal policy as did many of his fellow officers to not transport three prisoners with only one officer. Defendant Skol ignored his own policy when he decided to transport Plaintiff Cortez and the other two inmates by himself because he was in a hurry and his partner was busy completing paperwork. Defendant Skol knowingly transported these prisoners across "no man's land", without leg irons, while pulling a cart. There is evidence that he transported these prisoners knowing they had animosity with each other

- 21 -

and possibly knowing that Plaintiff Cortez had been a PC inmate at one point and inmates Cruz and Lavender had gang affiliations and likely had a "green light" to attack a former PC inmate like Plaintiff Cortez. Further, once the attack began, Defendant Skol's lack of action to intervene in the fight over the course of a five minute violent attack placed Plaintiff Cortez in substantial risk of serious harm. Viewing the facts in favor of Plaintiffs, they can establish that Defendant DeFabiis was deliberately indifferent to Plaintiff Cortez's safety. He is not entitled to qualified immunity.

**C. Gross Negligence**

Defendant State of Arizona argues it is entitled to summary judgment on the Arizona state law claim of gross negligence. Plaintiffs contend all the actions or lack of actions taken by officers on the day of the incident, in aggregate, show the State, through these employees, was grossly negligent in caring for the safety of Plaintiff Philip Cortez while he was in the State's custody. Defendant State of Arizona contends Plaintiffs have presented no evidence that a reasonable jury could find constituted gross negligence.

Under Arizona law, gross negligence "is action or inaction with reckless indifference to the result or the rights or safety of others. A person is recklessly indifferent if he or she knows, or a reasonable person in his or her position ought to know: (1) that his action or inaction creates an unreasonable risk of harm; and (2) the risk is so great that it is highly probable that harm will result." *Armenta v. City of Casa Grande,* 71 P.3d 359, 364-365 (Ariz.Ct.App.2003) (internal citation omitted). Under the doctrine of respondeat superior, an employer is vicariously liable for the acts of its employees when those acts are within the scope of the employees' authority and performed to further the employer's interests. *Owen v. Superior Court of the State of Arizona, In and For Maricopa County*, 649 P.2d 278, 281 fn. 6 (Ariz.1982).

A reasonable jury could find that numerous actions and inactions by Defendants created an unreasonable risk of harm to Plaintiff Cortez and the risk was so great that it was highly probable harm would result. To begin, the leg iron policy created risk to Plaintiff Cortez. Evidence presented in the briefing shows prison officials and officers

knew a post order required leg restraints at the time of the attack. (Doc. 198-9, at 3-4; Doc. 198-10, at 3-4). Yet, it was the status quo to not use leg restraints because of a former warden's seemingly unwritten policy. While no injuries had occurred prior to the attack on Plaintiff Cortez, transferring inmates without leg restraints and in violation of written policy created risk and probable harm.

Further, on the day of the attack, almost all of Defendant Skol's actions increased the risk that Plaintiff Cortez would be harmed. Because Defendant Skol was in a hurry to get the inmates back to the MDU for a prisoner count, he violated a personal policy and one held by other officers to not transport three inmates alone across "no man's land." It is alleged Defendant Skol further divided his attention by pulling a cart of documents across this dirt lot while transferring the three inmates. There is evidence that Defendant Skol knew the three inmates had animosity with each other and that inmate Cruz was kicking Plaintiff Cortez when Defendant Skol opened the back cage in visitation to transport them.

Once the attack began, Defendant Skol appears to have done very little to stop the attack. Whether this was a wise choice or a grossly negligent one is a decision that the jury should make. Over the course of five minutes while inmates Cruz and Lavender were kicking Plaintiff Cortez and stomping on his head, Defendant Skol only sprayed inmates Cruz and Lavender with pepper spray three times. According to his own report, Defendant Skol did not deploy the first burst of pepper spray until two minutes into the attack. Besides call for back-up, Defendant Skol did nothing else to stop the attack on Plaintiff Cortez.

Also factoring into a gross negligence analysis is Sergeant Hawthorne's testimony that a report attributed to him was forged. Sergeant Hawthorne, an employee of the State who would seem to have little motivation to lie, testified in deposition that he did not create the report that stated inmates Cruz and Lavender voluntarily ceased their attack when back up officers arrived on the scene. Sergeant Hawthorne testified that he physically intervened to stop the attack. He testified that someone forged the signature on

a report allegedly signed by him.

Summary judgment for Defendants is inappropriate on the gross negligence claim. A reasonable jury could find Defendant State of Arizona was grossly negligent.

**V. RECOMMENDATION**

The Magistrate Judge first notes Marty Cortez is not alleging any § 1983 claims on her own behalf. Second, Plaintiffs concede summary judgment is appropriate for claims against Defendant Kendall. Thus, the District Court should grant summary judgment on Count Three of the second amended complaint.

The Magistrate Judge recommends summary judgment also be granted to Defendant DeFabiis on the § 1983 claim, Count Five, or, in the alternative, that he be granted qualified immunity. The Magistrate Judge recommends that the motion for summary judgment be denied as to Defendant Skol, Counts Two and Four. The Magistrate Judge also recommends that Defendant State of Arizona be denied summary judgment on its state law gross negligence claim, Count 1.

Pursuant to 28 U.S.C. § 636(b)(1), any party may file and serve written objections within 14 days after being served with a copy of this Report and Recommendation. If objections are not timely filed, the party's right to de novo review may be waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003) (en banc). If objections are filed, the parties should direct them to the District Court by using the following case number: cv-09-526-TUC-JGZ.

Dated this 20th day of April, 2012.

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE

- 24 -